UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,   CRIM. NO. 15-86 (DSD/JSM)

    Plaintiff,

v.   REPORT AND RECOMMENDATION

(1) MARK ARLIN HAMMERSCHMIDT,

    Defendant.

This matter is before the Court upon defendant Mark Hammerschmidt's Motion for Suppression of Confessions or Statements [Docket No. 43]. Michelle E. Jones, Assistant United States Attorney, appeared on behalf of the Government. James E. Ostgard, Esq. appeared on behalf of defendant Mark Hammerschmidt, who was personally present. The matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

Defendant has moved to suppress statements made by him on or about February 9, 2012, during the execution of a search warrant at his residence in Shakopee, Minnesota. On June 10, 2015, this Court conducted an evidentiary hearing and took testimony from Special Agent Kenneth Fry of the IRS Criminal Investigation Division.

## I.  FACTUAL BACKGROUND

Special Agent Fry testified that on February 9, 2012, he participated in the execution of a search warrant at defendant's residence at XXXX Oxford Road South in Shakopee, Minnesota ("Residence"). Tr. 45-46 [Docket No. 65]. Special Agent Fry described the search as follows:

At approximately 9:35 a.m., ten or eleven law enforcement agents arrived at the Residence to conduct the search. Tr. 46. Special Agent Steve Kuntsman, the team leader, knocked on the door and announced the presence of law enforcement. Id. Defendant answered the door. Id. Special Agent Kuntsman identified himself and explained that he had a search warrant for the Residence. Tr. 47. Agents then entered the Residence and conducted a security sweep, which took a few minutes. Tr. 47, 63. During the security sweep, Special Agent Fry determined that there were four occupants present in the Residence—defendant, his wife Ornella Hammerschmidt, and two other individuals who Special Agent Fry believed to be relatives. Tr. 47-48. Special Agent Fry stated that for safety reasons, law enforcement agents had their weapons drawn during the security sweep of the Residence. Tr. 63, 71. The two unidentified persons asked to leave the Residence shortly after the search started, and they were permitted to do so. Tr. 55-56.

Special Agent Fry testified that upon completion of the security sweep, he was asked to assist Special Agent Brian Pitzen with an interview of defendant. Tr. 48. Special Agent Fry also testified that, prior to the search, law enforcement officers had planned to interview defendant and Ornella Hammerschmidt if they were present. Tr. 62. Prior to the interview, Special Agent Pitzen informed defendant that law enforcement agents were there for a search warrant and explained the process that would take place that day. Id. Special Agent Pitzen told defendant that he was not under arrest and that he was free to leave at any time. Tr. 48, 66. Special Agent Pitzen indicated to defendant that he would like to ask him some questions, and defendant agreed to answer. Id.

The interview took place at the dining room table in the dining room. Tr. 49. Special Agent Fry described the dining room as an "open floor plan" with some open doorways to other rooms. Tr. 50, Gov't Ex. F (photograph of the dining room in which the interview was conducted). Id. During the interview, defendant was seated in the chair that backed up against the buffet. Tr. 50, 60. Special Agent Pitzen sat in the chair directly across from Special Agent Fry. Id. Behind Special Agent Pitzen's chair was a wall, which contained an opening to another room. Tr. 61. Defendant was seated at the end of the table, next to the window.[1] Tr. 50, 60. Special Agent Fry testified that neither he nor Special Agent Pitzen was blocking the doorways. Id. Special Agent Fry testified that he is 6'1" tall, weighs approximately 230 pounds, and works out with weights. Tr. 69-70.

Special Agent Fry stated that after he, Special Agent Pitzen, and defendant [2] sat down at the dining room table, Special Agent Pitzen produced a small card, (Tr. 51), which contained the following statement:

> "As a special agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses.
>
> "In connection with my investigation of your tax liability (or other matter), I would like to ask you some questions.

---

[1] Defendant maintained that "[h]e was directed to sit in a chair at the end of the table and remain in the dining room while the search was being conducted and while being questioned." Memorandum in Support of Motion for Suppression of Confessions or Statements ("Def.'s Mem."), pp. 13-14 [Docket No. 61]. The Court found no testimony in the record to support this assertion.

[2] Initially, Special Agent Fry stated that the only persons present during the interview were himself, Special Agent Pitzen, and defendant. Id. Later, Special Agent Fry testified that approximately 30 minutes into the interview, Special Agent Marissa Pitzen, the case agent, arrived at the Residence and took over Special Agent Brian Pitzen's role in interviewing defendant. Tr. 57-58.

> However, first I advise you that under the 5th Amendment to the Constitution of the U.S., I cannot compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way. I also advise you that anything which you say and any documents which you submit may be used against you in any criminal proceedings which may be undertaken. I advise you further that you may, if you wish, seek the assistance of any attorney before responding.
>
> "Do you understand these rights?"

Gov't Ex. E (quotation marks in original).[3]

---

[3] A separate "In-Custody Statement of Rights" was printed on the reverse side of the card, which provided:

> Before we ask you any questions, it is my duty to advise you of your rights.
>
> - You have the right to remain silent.
>
> - Anything you say can be used against you in court, or other proceedings.
>
> - You have the right to consult an attorney before making any statement or answering any question, and you may have an attorney present with you during questioning.
>
> - You may have an attorney appointed by the U.S. Magistrate or the court to represent you if you cannot afford or otherwise obtain one.
>
> - If you decide to answer questions now with or without a lawyer, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer. HOWEVER…
>
> - You may waive the right to advice of counsel and your right to remain silent, and you may answer questions or make a statement without consulting a lawyer if you so desire.

Gov't Ex. E.

Special Agent Fry testified that agents did not read defendant the "In-Custody Statement of Rights" because defendant was not in custody or under arrest. Tr. 59.

Special Agent Pitzen read the above statement verbatim to defendant, and then asked defendant whether he understood his rights. Tr. 53. Defendant responded that he did. Id. Special Agents Fry and Pitzen then conducted an interview, which lasted approximately 1 hour and 20 minutes.[4] Tr. 53-54.

Special Agent Fry described the tone of the interview as casual and cordial. Tr. 53. Defendant was cooperative, appeared to understand all questions asked of him, and responded appropriately to those questions. Id. Defendant never indicated that he was confused about whether he had to continue the interview and never stated that he wanted to terminate the interview, get a drink of water, or use the restroom. Tr. 54. However, had defendant asked to get a drink of water or use the restroom, he would have been permitted to do so. Id. During the interview, there was no yelling or raised voices, no threats or promises made to defendant, no display of weapons from the holsters,[5] and no use of physical force. Tr. 54-55. Defendant was not handcuffed during the interview or at any time during the execution of the search warrant. Tr. 55. Special Agent Fry also recalled that other law enforcement agents were wandering through the dining room occasionally during the interview. Tr. 69.

Towards the conclusion of the interview, Special Agent Fry told defendant that he did not believe defendant was being fully truthful with respect to some questions, and that now was the time to answer truthfully. Tr. 57. Special Agent Fry also informed

---

[4] Special Agent Fry stated that the interview began minutes after law enforcement agents entered the Residence and estimated that it started around 9:42 a.m. Tr. 48-49.

[5] Special Agent Fry testified that weapons were worn by all law enforcement agents present at the Residence. Tr. 54, 63. These weapons were drawn during the security sweep, (Tr. 63), but they remained holstered during the interview of defendant. Tr. 54.

defendant of some of the potential penalties for the charges involved in the investigation. Id. With respect to this exchange, Special Agent Fry stated that his tone was "[j]ust like I'm talking right now." Id. Defendant nodded his head and said that he did not have an attorney but was going to look into hiring one. Tr. 57. When defendant made this statement, agents concluded the interview. Id. The search was completed at approximately Noon. Tr. 73. Defendant was not arrested at the termination of the interview. Tr. 56. At some point after the interview, defendant and Ornella Hammerschmidt requested to leave the Residence, and they were permitted to do so. Tr. 58.

Law enforcement agents continued to search the Residence both during and after the interview. Tr. 58, 68-69. At no time during the search was defendant permitted to wander about the house. Tr. 68, 72-73. Special Agent Fry explained that persons are never permitted to wander freely during a search for safety reasons. Tr. 73. Persons may leave the premises, but if they stay, they must remain in a certain area and have agents nearby. Id. Neither defendant nor Ornella Hammerschmidt was present at the Residence when the search concluded. Tr. 58-59.

## II. DISCUSSION

Defendant argued that his statements to law enforcement agents during the interview must be suppressed because he was "in custody" and, therefore, he should have been given Miranda warnings prior to questioning. The Government disagreed, arguing that as defendant's freedom was not sufficiently restrained to constitute a formal arrest, he was not in custody and no Miranda warning was required. Both parties relied on the six "indicia of custody" discussed in United States v. Griffin, 922 F.2d 1343, 1349

6

(8th Cir. 1990). See Def.'s Mem., pp. 3-4; Memorandum in Opposition to Motion for Suppression of Confession of Statements, p. 6 [Docket No. 68].

Under Miranda v. Arizona, an individual must be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning. 384 U.S. 436, 444 (1966); see also Griffin, 922 F.2d at 1347. Accordingly, the protections afforded by Miranda are triggered when an individual "'is both in custody and being interrogated.'" United States v. Boyd, 180 F.3d 967, 976-77 (8th Cir. 1999) (quoting United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995)).

"The 'ultimate question in determining whether a person is in 'custody' for purposes of Miranda is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Williams, 760 F.3d 811, 814 (8th Cir. 2014) (quoting United States v. Czichray, 378 F.3d 822, 826 (8th Cir.2004)). "To answer that question, we consider the totality of the circumstances that confronted the defendant at the time of questioning, and inquire whether a reasonable person would have felt that he or she was free to terminate the interview and leave." Id. (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995)); see also U.S. v. Perrin, 659 F.3d 718, 719 (8th Cir. 2011) ("We consider 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave[ ]' . . . .") (quoting J.D.B. v. North Carolina, 131 S.Ct. 2394, 2402 (2011)); United States v. New, 491 F.3d 369, 373 (8th Cir. 2007) ("The custody inquiry thus turns on whether, given the totality of the circumstances, a reasonable person

7

would have felt at liberty to terminate the interrogation and leave . . . .") (citation omitted).  "We do not ask how [the defendant] perceived the situation; . . . the point is how a reasonable person would have seen his options in the circumstances."  Perrin, 659 F.3d at 719 (citation omitted); see also United States v. Wolk, 337 F.3d 997, 1006 (8th Cir. 2003) ("'[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'") (alteration in original) (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).

When determining whether a suspect is in custody, courts often (but not always)[6] cite to and consider the following non-exhaustive six "indicia of custody" articulated in Griffin:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during the questioning;
>
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
>
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
>
> (5) whether the atmosphere of the questioning was police dominated;  and
>
> (6) whether the suspect was placed under arrest at the termination of the questioning.

---

[6]  For example, the Eighth Circuit made no mention of the Griffin factors in Williams and New.

8

United States v. Thomas, 664 F.3d 217, 222 (8th Cir. 2011) (citing Griffin, 922 F.2d at 1349). However, "[i]t is not necessary to a finding of custody that all of the foregoing indicia be presented by the factual circumstances of a case . . . ." Griffin, 922 F.2d at 1349. "'[A] particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors.'" Thomas, 664 F.3d at 222 (citation omitted). Further, the Griffin factors "are not by any means exclusive, and . . . 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Czichray, 378 F.3d at 827; see also Perrin, 659 F.3d at 720 (cautioning the parties that the Griffin factors are "simply a rubric for considering the ultimate issue, not a mandatory checklist"); United States v. Ollie, 442 F.3d 1135, 1137-38 (8th Cir. 2006) ("No single [Griffin] consideration is dispositive, nor must they all weigh in the defendant's favor for us to decide that he or she was in custody.") (citation omitted); United States v. Axsom, 289 F.3d 496, 501 (8th Cir. 2002) ("A finding of custody does not require the factual circumstances of a case to present all indicia; and a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor.") (citation omitted).

Applying these principles, under the totality of the circumstances, the Court finds that defendant was not in custody at the time he was interviewed and, therefore, his motion to suppress his statements should be denied.

First, the circumstances of the interview "did not bring about a restraint on [defendant's] freedom of movement of the degree associated with formal arrest." Williams, 760 F.3d at 815. Defendant was never handcuffed during questioning or at any time during the search of the Residence. During the interview, Special Agents Fry

9

and Pitzen did not employ physical force, display their weapons, or make any threats indicating that defendant was not free to leave.[7] After questioning, defendant was not arrested and was permitted to leave the Residence with his wife. All of these circumstances demonstrate that defendant was not restrained in his ability to terminate the interview and leave the premises.

Second, and significantly, Special Agent Pitzen informed defendant prior to questioning that he was not under arrest and that he was free to leave at any time. "'The most obvious and effective means of demonstrating that a suspect has not been taken into custody ... is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.'" Williams, 760 F.3d at 814; Czichray, 378 F.3d at 826 (quoting Griffin, 922 F.2d at 1349) (same). As the Eighth Circuit observed in Czichray:

> [A]bundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody. That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview. So powerful, indeed, that no governing precedent of the Supreme Court or this court, or any case from another court of appeals that can be located (save one decision of the Ninth Circuit decided under an outmoded standard of review, United States v. Lee, 699 F.2d 466, 467–68 (9th Cir.1982) (per curiam)), holds that a person was in custody after being clearly advised of his freedom to leave or terminate questioning.

378 F.3d at 826; see also Williams, 760 F.3d at 814 ("'We have long regarded these admonitions as weighty in the custody analysis. And we have never held that a person

---

[7] Defendant admitted there was no evidence that the agents used strong-arm tactics or deceptions during the interview. Def.'s Mem., pp. 12-13.

was in custody after receiving them.'") (quoting Perrin, 659 F.3d at 721); Ollie, 442 F.3d at 1138 ("While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning."). Because defendant was expressly informed prior to questioning that he was not under arrest and was free to leave at any time, a reasonable person in defendant's position would have felt at liberty to terminate the interview and leave the Residence. See Perrin, 659 F.3d at 721 ("Considering the totality of the circumstances, we hold the Perrin was not in custody when Agent Scherer questioned him in Perrin's bedroom. Most importantly, about ten minutes beforehand, Agent Scherer had told Perrin and the three other residents present that they could leave and did not have to answer questions if they stayed."); New, 491 F.3d at 374 ("Given that Cresalia plainly communicated New's freedom to decline the interview and took no other actions to aggravate the environment, we conclude that New was not in custody, and the Miranda warnings were not required.") (footnote omitted).

Third, even though defendant did not initiate contact with law enforcement, he voluntarily acquiesced to questioning. Prior to the interview, Special Agent Pitzen told defendant that he did not have to answer any questions, that anything he said could be used against him in criminal proceedings, and that he could consult with an attorney before answering. Special Agent Pitzen asked defendant whether he understood his rights, and defendant responded that he did. During questioning, defendant was cooperative and responded appropriately to all questions. Defendant never attempted

to terminate the interview and never expressed confusion as to whether he had to continue. As soon as defendant stated that he was planning to hire a lawyer, agents concluded the interview. Based upon these facts, the Court finds that defendant voluntarily acquiesced to questioning. See Axsom, 289 F.3d at 502 ("Axsom was extremely friendly and cooperative during the interview. He offered to show agents which of his two computers contained child pornography, the target he shot to obtain his concealed handgun license, and his Samurai sword collection. We, therefore, find the historical facts establish the presence of the third [Griffin] factor.").

Fourth, while the Court agrees with defendant that the interview occurred in a police-dominated environment, that does not lead the Court to conclude that he was in custody. On the one hand, during the search of the Residence, defendant was continuously under law enforcement supervision and, for safety reasons, he was not permitted to wander the house freely. See Griffin, 922 F.2d at 1350-51 ("We realize that the likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest."). Defendant was questioned in the dining room, away from the other occupants of the Residence. See id. at 1352 ("A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements . . . .") (citation omitted). During the interview, defendant sat with his back to a window, with agents sitting on either side of him. To exit the room, defendant would have had to walk past the special agents seated on either side of him. As the interview was being conducted, armed federal agents intermittently passed

through the living room. Given these circumstances, it is clear that law enforcement agents had taken control of the premises, and defendant did not possess complete freedom to move about the Residence.

However, in determining whether defendant was in custody, "'[t]he critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way.'" United States v. Diaz, 736 F.3d 1143, 1149 (8th Cir. 2013) (quoting United States v. Cowan, 674 F.3d 947, 957 (8th Cir. 2012)). When police execute a search warrant, as in this case, the environment is inherently police dominated, but that alone does not constitute an arrest. Williams, 760 F.3d at 815; see also United States v. Merrell, Crim. No. 14-358 (DSD/JJK), 2015 WL 736540, at *8 (D. Minn. Feb. 20, 2015) ("Although the interview involved three law enforcement officers, one of which accompanied Merrell throughout the search that followed, and a team of approximately ten law enforcement personnel executed the search warrant for the house, there is no requirement that Miranda warnings precede any questioning merely because a group of officers execute a search warrant.") (citation omitted). Special Agent Fry testified that although persons may not wander freely during a search, they are permitted to leave the premises. As such, even though the interview occurred in a police-dominated environment, defendant's freedom to depart was not restricted.[8]

Further, "[w]hen a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." Axsom, 290 F.3d at

---

[8] The Court notes that although 10 or 11 law enforcement agents conducted the search, only two agents conducted the interview, which suggests that the interview itself was not police-dominated. Axsom, 289 F.3d at 502 ("While nine persons participate in the execution of the search warrant, only two agents conducted the interview.").

13

502 (citation omitted); see also Williams, 760 F.3d at 815 ("When a person is questioned 'on his own turf,' we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'") (internal quotations marks and citations omitted); Perrin, 659 F.3d at 721 ("A reasonable person would have taken some comfort, however, in being in his own bedroom instead of an interrogation room at the police station.") (citations omitted); Ollie, 442 F.3d at 1139 ("But we do find that the interview took place in a police-dominated atmosphere and that this atmosphere would have restrained a reasonable person's movements. In contrast to Axsom, where the suspect was interviewed at home, in this case the police questioned Mr. Ollie at the police station."); Czichray, 378 F.3d at 826-67 ("When a person is questioned 'on his own turf,' United States v. Rorez, 737 F.2d 753, 757 (8th Cir. 1984), we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'") (citations omitted). Here, the interview occurred in the safety and familiarity of the dining room of defendant's own home, as opposed to the police station, "where 'the investigator possesses all the advantages . . . .'" Williams, 760 F.3d at 815 (citation omitted).

Based on the totality of the circumstances, the Court concludes that notwithstanding the police-dominated atmosphere created by the execution of the search warrant, a reasonable person in defendant's position would not have believed that he was in custody. Defendant was apprised that he had a constitutional right not to answer questions and that doing so could be used against him in criminal proceedings. Notwithstanding this warning, defendant elected to proceed with questioning and never

expressed confusion over whether he had to continue the interview. During the interview, law enforcement agents did not employ strong-arm or deceptive tactics to elicit incriminating responses from defendant. When defendant indicated that he wanted to hire an attorney, agents immediately stopped the interview. Defendant was not arrested at the conclusion of questioning and was permitted to leave the Residence with his wife. Most importantly, defendant was expressly informed prior to questioning that he was not under arrest and that he was free to leave at any time. Based upon all of these circumstances, the Court concludes that defendant was not in custody when he was interviewed by Special Agents Fry and Pitzen. Accordingly, law enforcement agents were not required to read defendant his <u>Miranda</u> rights prior to questioning, and defendant's motion to suppress should be denied.

## III. RECOMMENDATION

For the reasons set forth above, IT IS HEREBY RECOMMENDED that

Defendant Mark Hammerschmidt's Motion for Suppression of Confessions or Statements [Docket No. 43] be **DENIED**.

Dated: July 16, 2015  *s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

**NOTICE**
Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 30, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.